**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NASEEM S. STANAZAI,

       *Plaintiff*,

    v.

BROADCASTING BOARD OF
GOVERNORS,

       *Defendant.*

Civil Action No. 17-2653 (RDM)

---

**MEMORANDUM OPINION AND ORDER**

This is the second case brought by Plaintiff Naseem Stanazai against Defendant Broadcasting Board of Governors ("Board")[1] alleging various forms of workplace discrimination. The Court entered judgment on behalf of the Board in April 2018 in the first case, *see Achagzai v. Broad. Bd. of Governors*, 308 F. Supp. 3d 396, 399 (D.D.C. 2018), and in two prior opinions in this matter, *see* Dkt. 21; Dkt. 35, the Court substantially narrowed the scope of this case. The sole remaining issue is whether the Board retaliated against Stanazai, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, by refusing to hire him for a senior editor position in October 2016. *See* Dkt. 21 at 6. The Board moves for summary judgment on the ground that there was no such "open position for Stanazai to fill." Dkt. 40-1 at 10. Because the undisputed evidence bears out this contention, the Court will **GRANT** the Board's renewed motion.

---

[1] Although the Board has since been renamed the Agency for Global Media, *see* Dkt. 40-2 at 1 (Def.'s SUMF ¶ 1), the Court uses the entity's name as of the dates relevant to this dispute.

# I.  BACKGROUND

For present purposes, the Court takes "the facts in the record and all reasonable inferences derived therefrom in the light most favorable" to Stanazai.  *Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017) (quoting *Al-Saffy v. Vilsack*, 827 F.3d 85, 89 (D.C. Cir. 2016)).

## A.    Factual Background

The Board is an independent federal agency that oversees a network of media organizations intended to "support . . . freedom and democracy" around the world.  Dkt. 40-2 at 1 (Def.'s SUMF ¶ 1); Dkt. 41-1 at 1 (Pl.'s Resp. ¶ 1).  One such media network is the Voice of America, which provides news via radio and television, along with digital, web, and mobile media, in 47 languages to an estimated 278 million people worldwide.  Dkt. 40-2 at 1 (Def.'s SUMF ¶ 2).  At all times relevant to this matter, Voice of America employed Plaintiff Nazeem Stanazai as an international broadcaster and copy editor who was compensated at General Schedule pay scale ("GS") level 12.  *See* Dkt. 15-6 at 1 (EEO Counselor's Rep.); Dkt. 40-2 at 1 (Def.'s SUMF ¶ 3).  Stanazai worked with the Afghan Service, within Voice of America's South and Central Asian Division, which "broadcasts on radio and television and publishes digital content in the Dari and Pashto languages."  Dkt. 40-2 at 1 (Def.'s SUMF ¶¶ 3–4).  The South and Central Asian Division's director was Akbar Ayazi from April 5, 2015 until August 25, 2019.  *Id.* at 2 (Def.'s SUMF ¶ 5); Dkt. 41-1 at 1 (Pl.'s Resp. ¶ 1).  For roughly six months during 2016, Ayazi also served as the acting chief of the Afghan Service.  Dkt. 40-2 at 2 (Def.'s SUMF ¶ 5); Dkt. 41-1 at 1 (Pl.'s Resp. ¶ 1); Dkt. 15-3 at 1 (Ayazi Decl. ¶¶ 1–2).  During Ayazi's brief tenure as acting chief, he oversaw a reorganization of the Afghan Service's management.  Dkt. 40-2 at 2 (Def.'s SUMF ¶ 6).

This reorganization is at the core of the instant dispute.  The parties appear to agree that,

prior to the reorganization, the Afghan Service "was organized into four groups: (1) Dari radio, (2) Pashto radio, (3) Dari and Pashto television, and (4) digital" and that the reorganization involved "reconfiguring the three radio and television services into two services organized by language." *Id.* (Def.'s SUMF ¶¶ 6, 8); *see* Dkt. 41-1 at 1 (Pl.'s Resp. ¶ 3) (acknowledging that "Ayazi . . . reconfigured the three radio and television services into two services, arranged by language"). But they dispute the management structure of those reconfigured divisions.

The Board maintains that the four groups that existed before the reorganization were each "led by a GS-13 employee referred to as either a 'managing editor' or 'supervisory international broadcaster.'" Dkt. 40-2 at 2 (Def.'s SUMF ¶ 6); *see also* Dkt. 15-3 at 1 (Ayazi Decl. ¶ 3). Following the reorganization, according to the Board, Ayazi made Lina Rozbih managing editor of one of the two resulting divisions, the Dari radio and television service, and Shaista Sadat Lami the managing editor of the other, the Pashto radio and television service. Dkt. 40-2 at 2–3 (Def.'s SUMF ¶¶ 9–10). Both positions were compensated at the GS-13 level (or its equivalent for noncitizens, the GG-13 level). *Id.* Ayazi further "assigned several 'new tasks'" as part of the reorganization, according to an email the Board attached to a prior filing. *Id.* at 3 (Def.'s SUMF ¶ 11); s*ee* Dkt. 15-3 at 4–5 (Ayazi Decl., Ex. 1). These included "assign[ing] Ahmad Sear Zia and Hafiz Assefi to be 'senior editors' on the Dari team and Roshan Noorzai and Hasib Alikozai to be 'senior editors' on the Pashto team." Dkt. 40-2 at 3 (Def.'s SUMF ¶ 11). The Board maintains that "[t]hese 'senior editor' designations were not new GS-13 positions," and each of the four individuals "identified by Ayazi as 'senior editors' were GS-12 International Broadcasters prior to Ayazi's email announcement and remained GS-12 International Broadcasters after the announcement." *Id.* (Def. SUMF ¶ 12). "Following the restructuring, th[ese] four individuals continued to perform the[] same duties for the newly structured teams

that were organized by language" as they performed when those teams were organized by broadcast medium. *Id.* (Def.'s SUMF ¶ 14).

According to Stanazai, in contrast, "Ayazi not only reconfigured the three radio and television services into two services, arranged by language, but [he] changed the editorship of the two new services." Dkt. 41-1 at 1 (Pl.'s Resp. ¶ 3). Referring to the "managing editor" position at the head of the newly created services, Stanazai maintains that Ayazi "promoted Ms. Rosbih as head of Dari radio and television and Ms. Lami as the head of Pashto radio and television," even though—according to Stanazai—he was "more qualified to be a managing editor" than either individual. *Id.* at 1–2 (Pl.'s Resp. ¶ 3). He also disputes the Board's assertions regarding the "senior editor" positions with each service, arguing that he "was overlooked" for those positions and that "most of th[e] individuals" who took those positions "were benchmarked to GS[-]13 in June 2017." *Id.* at 3 (Pl.'s Resp. ¶ 6).

**B.    Procedural History**

Stanazai filed this action on December 11, 2017, alleging discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*; age discrimination under the ADEA; and retaliation under the ADEA. Dkt. 1 at 6–9 (Compl. ¶¶ 16–29). After the Board moved for summary judgment on all three claims, Dkt. 15, the Court granted that motion in part on March 5, 2019, Dkt. 21. The Court held that Stanazai's Title VII claims failed as a matter of law because he "allege[d] discrimination on the basis of age (or retaliation for complaining about age discrimination)," and Title VII "proscribes only discrimination based on an individual's 'race, color, religion, sex, or national origin'—not age." *Id.* at 7 (quoting 42 U.S.C. § 2000e-2(a)). Turning to Stanazai's ADEA claims, the Court concluded that many of his hostile work environment and discrimination claims were barred by res judicata because the Court had

4

previously entered judgment in favor of the Board on those claims in a prior litigation.  *Id.* at 8; *see also Achagzai*, 308 F. Supp. 3d at 399.  Principles of administrative exhaustion further narrowed Stanazai's ADEA claims, leaving only his claims arising out of "Ayazi's alleged failure to promote Stanazai to a management position as part of his October 7, 2016 reorganization."  Dkt. 21 at 10.

As for those remaining claims, the Court held that "the Board ha[d] proffered unrebutted evidence that the October 2016 reassignments were part of a division-wide reshuffling of responsibilities" and that "[t]he reorganization did *not* create any vacant management positions." *Id.* at 12.  These reassignments, instead, "were part and parcel of Mr. Ayazi's effort to 'restructure the management' to 'streamline the workflow of the service.'"  *Id.* (alterations omitted) (quoting Dkt. 15-3 at 4).  And, "[g]iven that Stanazai was a GS-12, he could not have been reassigned to the roles of managing editor because those [we]re GS-13 positions."  *Id.* (alterations and quotation marks omitted).  As a result, Stanazai had failed to make out a prima facie case of discrimination or retaliation "with respect to Stanazai's claim that he was not selected as a managing editor."  *Id.* at 11.

Reading Stanazai's complaint liberally, however, the Court was persuaded that "Stanazai not only alleges that the Board failed to promote him to managing editor, a GS-13 position, but . . . also . . . that he 'applied for *several* management positions that became available'" and that he "was denied [promotion] as reprisal for his EEO complaints.'"  *Id.* at 13 (emphasis in opinion) (quoting Dkt. 1 at 5 (Compl. ¶ 13)).  The Board had "failed to address [that] claim altogether," and, unlike the two "managing editor" positions, there was no evidence that the four "senior editor" positions were limited to GS-13 employees.  *Id.*  The Court, accordingly, declined to grant summary judgment on that claim.  *Id.*

After the parties engaged in discovery, the Board moved for reconsideration or, in the alternative, for summary judgment, on the ground that Stanazai had abandoned any claim related to the four "senior editor" positions.  Dkt. 31-1 at 7.  The Board pointed to Stanazai's deposition, in which he was asked to name all of the management positions he was claiming that he had been unlawfully denied.  *See* Dkt. 31-3 at 9–17, 21–26 (Stanazai Dep. 9:4–17:6; 21:10–26:14).  Because Stanazai mentioned various positions—including web editor and managing editor—but did not mention the "senior editor" positions, the Board argued that Stanazai had "disavowed any claim of retaliation regarding the senior editor assignment," Dkt. 34 at 1.  In denying the Board's motion for reconsideration, the Court noted that "nothing in the Federal Rules of Civil Procedure specifically provides for the abandonment of an individual legal claim through deposition testimony" and concluded that Stanazai had not abandoned his claim (even if he could do so) through his deposition testimony.  Dkt. 35 at 9–11 (quoting *Lemmons v. Georgetown Univ. Hosp.*, 241 F.R.D. 15, 29 (D.D.C. 2007)).  On the merits, while "recogniz[ing] that Plaintiff ha[d] done little to show that he is entitled to prevail," *id.* at 16, the Court held the Board's "cursory discussion" of the merits of Stanazai's claim "d[id] not justify the entry of summary judgment in its favor," *id.* at 13, 16.

The Board has moved for summary judgment for a third time.  Dkt. 40.  In this iteration, the Board argues that (1) Stanazai cannot make out a prima facia case for retaliation because there were never any open positions for senior editor; and (2) for the same reason, the Board had "legitimate, nonretaliatory reasons for not naming Stanazai a 'senior editor.'"   Dkt. 40-1 at 10, 14.  Stanazai opposed the Board's motion, Dkt. 41, and the Board filed its reply, Dkt. 42.

## II.  LEGAL STANDARD

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it can "show[] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it could affect the outcome of the litigation under governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving party to show that sufficient evidence exists for a reasonable jury to find in the nonmoving party's favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).  The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.  That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir.

1987).  If the nonmoving party's evidence is "merely colorable" or "not significantly probative,"
the Court should grant summary judgment.  *Liberty Lobby*, 477 U.S. at 249–50.

### III.  ANALYSIS

The Board's two arguments in favor of summary judgment present two sides of the same
coin.  The Board argues, first, that "Stanazai cannot make out a prima facie case of retaliation
regarding the 'senior editor' assignments . . . because there were never any open position[s] for
Stanazai to fill."  Dkt. 40-1 at 10.  And the Board's second argument is that it "had legitimate,
nonretaliatory reasons for not naming Stanazai a 'senior editor'"—namely, "he was not selected
because there was no selection associated with those assignments."  *Id.* at 14.  The crux of both
arguments is that "there were no new 'senior editor' positions created as part of Ayazi's
restructuring of the [Afghan Service] and no competitive selection process took place to fill those
assignments."  *Id.* at 13.  Instead, according to the Board, "[t]he four individuals designated as
senior editors . . . retained the same grade and position as they had held prior to the restructuring
. . . [and] continued to perform the same duties and functions that they had been responsible for
prior to the restructuring."  *Id.*  Relying on the Court's prior observation that Stanazai's claims
fail if he "he cannot establish a vacancy in the position sought," the Board contends that the
undisputed evidence shows that there was no vacancy to fill and that it is now entitled to
summary judgment.  *Id.* at 13 (quoting Dkt. 21 at 12) (arguing that Stanazai has failed to make
out a prima facie case); *id.* at 14 (noting that "[t]he agency's nonretaliatory reasons for not
selecting Stanazai as a 'senior editor' largely overlap with the reasons that Stanazai cannot make
out a prima facie claim").  Accordingly, the Court must determine whether the Board is correct
that the *undisputed* evidence establishes that there was no "vacancy in the position sought," Dkt.
21 at 12—that is, the position of "senior editor."

For support, the Board has submitted declarations from Leslie McKnight, a human resources specialist with the Board, and Ibrahim Nasar, who served as managing editor of Pashto Radoi within the Afghan Service until the 2016 reorganization, at which point he became special projects manager for the Afghan Service. *See* Dkt. 40-3 (McKnight Decl.); Dkt. 40-4 (Nasar Decl.). In her declaration, McKnight represents that she is "familiar with the [Board's] personnel practices and records" and that she has "reviewed the personnel files" of the four individuals assigned as "senior editors" in 2016. Dkt. 40-3 at 1 (McKnight Decl. ¶¶ 1, 4). Based on that review, McKnight attests that "[n]one of them received a grade increase or any other form of promotion in connection with Ayazi's announcement and none of their position descriptions changed in connection with Ayazi's announcement." *Id.* at 1–2 (McKnight Decl. ¶ 4). Although one of those individuals was later promoted to "an open GS-13 Supervisory News Editor (Digital) position as part of a competitive selection," according to McKnight, "Stanazai did not apply for th[at] open position." *Id.* at 2 (McKnight Decl. ¶ 4).

Nasar, for his part, represents that he has "personal knowledge of the roles and duties of individuals employed in the Afghan Service," including that Stanazai served as an international broadcaster assigned to Pashto Radio when Nasar was managing editor of that service. Dkt. 40-4 at 1 (Nasar Decl. ¶¶ 1–2). Nasar further represents that he is "familiar with [the] email sent by Akbar Ayazi on October 7, 2016, in which Ayazi announced the new management structure for the Afghan Service and stated that he had asked certain individuals to serve as 'senior editors.'" *Id.* (Nasar Decl. ¶ 3). And, based on his "experience and observation," Nasar attests that "the duties and responsibilities of the individuals labelled by Ayazi as 'senior editors' did not change following the October 2016 announcement." *Id.* (Nasar Decl. ¶ 4). Instead, according to Nasar, before the reorganization those individuals were merely called "team leaders," rather than

"senior editors," but their duties both before and after "included assisting in the assignment of tasks, finding news stories for broadcast, and copy editing." *Id.* at 1–2 (Nasar Decl. ¶ 4); *see also id.* at 2 (Nasar Decl. ¶ 4 ("The four named individuals continued to perform these same duties for their respective language teams following the restructuring.").

Stanazai offers no evidentiary rebuttal whatsoever to the relevant portions of the McKnight or Nasar declarations. In his brief, he muses that "Defendant would want this court of [sic] blindly believe that all these new positions, i.e. going from team leader to senior editor and receiving GS13 within a few months, or in Ms. Lami's case, going from on air talent to an actual editor, are all 'reassignments'" and wonders, "[i]f that is the case, whey [sic] did he not 'reassign' Mr. Stanazai, a US citizen, who was and should have been benchmarked to GS13 several years ago, nearly going back to 2010." Dkt. 41 at 3. But the Board has not asked this Court to "blindly believe" its position; rather, it has submitted two declarations that aver, under the penalty of perjury, that that none of the four "senior editors" "received a grade increase or any other form of promotion in connection with Ayazi's announce," Dkt. 40-3 at 1–2 (McKnight Decl. ¶ 3); that "none of their position descriptions changed in connection with Ayazi's announcement," *id.*; and that "the duties and responsibilities of the individuals labelled by Ayazi as 'senior editors' did not change following the October 2016 announcement," Dkt. 40-4 at 1–2 (Nasar Decl. ¶ 4).

As the Board acknowledges, one of the four "senior editors," Amad Sear Zia, was later promoted to a GS-13 position. Dkt. 40-3 (McKnight Decl. ¶ 4). But, as noted above, that promotion came months after Ayazi's adoption of the "new 'management structure' for the Afghan Service" and was the result of "a desk audit unrelated to [that] new management structure." *Id.* (McKnight Decl. ¶¶ 2, 4). Similarly, Hasib Alikozai was "separately promoted to

an open GS-13 Supervisory News Editor (Digital) position as part of a competitive selection," but Stanazai did not apply for that open position." *Id.* (McKnight Decl. ¶ 4).

More fundamentally, neither Stanazai's "affidavit" nor any of the other material he has submitted joins issue with the Board's showing that there was no vacant GS-12 (or GG-12) position to fill as part of Ayazi's adoption of a "new management structure" in October 2016.[2] Stanazai contends that he "always sought a senior editor assignment/position," that the "senior editor" position was never advertised, that he was better qualified than the four "senior editors," that he "always was available to be 're-assigned,'" and that he deserved—but never received—a promotion to a GS-13 position. Dkt. 41-2 at 18–20. Beyond that, his "affidavit" stresses that he was a U.S. citizen, while Lami Rosbih was not. *Id.* at 18. But none of this has anything to do with whether the "senior editor" designation constituted a new position to be filled or whether it was merely a different title for those who already served as "team leaders," who continued to perform the same essential duties for the same pay. The only evidence before the Court conclusively demonstrates that all that changed was the title and allocation of specific (and previously assigned) tasks among the four "senior editors."

Stanazai also points to the email in which Ayazi announced the reorganization, asserting that Ayazi's comment that "'[a]ll four [senior] editors will support [the managing editors] in

---

[2] As the Board correctly observes, Stanazai's "affidavit" is neither signed nor attested to under the penalty of perjury. *See* Dkt. 42 at 3 n.2. More troubling still, that affidavit begins "I, *Tahir M. Achagzai* being first duly sworn, depose[] and state[] under the penalty of perjury as follows." Dkt. 41-2 at 18 (emphasis added). Tahir Achagzai is the name of another plaintiff who sued the Board for workplace discrimination alongside Stanazai in a prior litigation. *See Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 179 (D.D.C. 2016). As discussed above, the Court entered judgment for the Board in that matter on April 20, 2018. *Achagzai*, 308 F. Supp. 3d at 411. As a result, Stanazai's "affidavit" does not constitute competent evidence. But that makes little difference here, because the "affidavit" does not controvert the Board's showing that there was no vacancy to fill.

leading the teams' . . . implies that 'senior editor' position is a different position, with different duties and responsibilities, than the 'team leader' position." Dkt. 41 at 5; *see also* Dkt. 15-4 at 4–5 (Ayazi Decl., Ex. 1) (Ayazi email). Ayazi's comment, however, does nothing to contradict Nasar's attestation that, before and after the reorganization, the duties of the four individuals assigned as senior editors "included assisting in the assignment of tasks, finding news stories for broadcast, and copy editing." Dkt. 40-4 at 1–2 (Nasar Decl. ¶ 4).

Nor do any of the other exhibits to which Stanazai points in support of his opposition bear any relation to the argument raised in the Board's motion for summary judgment. Stanazai, instead, offers an email exchange with Ayazi regarding his concerns regarding grammatical errors within the Afghan Service's broadcasts, *see* Dkt. 41-2 at 2–5 (Ex. 1); a 2020 email exchange in which Stanazai complains that he has remained a GS-12, despite assurances that he would "bench-marked for GS[-]13," *see id.* at 7–8 (Ex. 2); and an application Stanazai submitted, after the events relevant to this case, for a position other than the one at issue here, along with that position's job posting, *see id.* at 10–15 (Ex. 3).

All of this leaves the Court with uncontested declarations from the Board attesting that "none" of the individuals assigned to senior editor positions "received a grade increase or any other form of promotion in connection with Ayazi's announcement," Dkt. 40-3 at 1–2 (McKnight Decl. ¶ 4), and that "the duties and responsibilities of the individuals labelled by Ayazi as 'senior editors' did not change following the October 2016 announcement." Dkt. 40-4 at 1 (Nasar Decl. ¶ 4). That evidence shows that, as with the managing editor positions, the creation of the senior editor positions "did not *create* any vacant management positions" but rather "were part and parcel of [the] effort to restructure the management and to streamline the workflow" of the Afghan Service. Dkt. 21 at 12 (alterations omitted).

On that record, the Court must conclude that Stanazai has failed to identify "a vacancy in the position sought," *id.*—here, that of senior editor.  With respect to any claim of discrimination, this conclusion resolves the case.  A discrimination claim requires "an adverse employment action," which must "'affect[] the terms, conditions, or privileges or employment or future employment opportunities.'"  *Achagzai*, 308 F. Supp. 3d at 404 (quoting *Ortiz-Diaz v. U.S. Dep't of Hous & Urban Dev., Office of Inspector Gen.*, 867 F.3d 70, 73 (D.C. Cir. 2017)); *see also id.* (holding that "[a]n adverse employment action" requires a failure to promote or to hire or "a significant change in [employment] benefits").

The question is slightly more complicated, however, with respect to Stanazai's retaliation claim because "[a] retaliation claim is 'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend to [other] harms[,] . . . so long as 'a reasonable employee would have found the challenged action materially adverse.'"  *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S 53, 64 (2006)).  In this context, an action is "adverse" if "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *White*, 548 U.S. at 68 (quotation marks omitted).  Notwithstanding this less demanding standard, however, Stanazai faces two insurmountable obstacles.  First, he does not argue that the failure to give him the title of "senior editor" or to assign him the duties of that position would have dissuaded a reasonable worker from making charges of discrimination.  Rather, the focus of his "affidavit" and arguments is that he deserved to be promoted to a GS-13 level position.  That, however, was not on the table when Ayazi created the new title of "senior editor."  Second, and more importantly, the undisputed evidence shows that the Board did not subject Stanazai to an adverse action of any kind—the Board left everyone in essentially the same position, with the same pay, as before the "new management structure" was adopted.  It

13

merely changed the name of the "team leader" position to "senior editor" and reallocated assignments based on language rather than media.

The Court, accordingly, is persuaded that Stanazai's remaining claims relating to the "senior editor" position fail because there was no new position to fill and no selection process from which he was excluded.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Board's renewed motion for summary judgment.

A separate order shall issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 12, 2022